My name is 161663. I'm going to probably butcher this name, but I'll call it Kaquelin v. U.S. and you can correct me if I'm wrong, Ms. Kranz. Good morning, may it please the court. My name is Eric Kranz. I represent the United States in this case and with me at council's table is Tyler Burgess, also from the Justice Department. In this Trails Act takings case, the CFC erroneously held that the government action affected a physical taking that was per se compensable. The court reached this conclusion even though Section 8D of the Trails Act was never triggered by a trail use agreement and so trail use was never authorized and the statute's effect of precluding easement expiration was never made operational. So what is your position? So this is one of the more unusual cases, at least unlike Caldwell. Caldwell, well, there was ultimately a conversion to trails, right? That's correct. Ladd, there wasn't? Ladd was the only case this court has heard where there was not a conversion to trail use. And here, there is or is not a conversion? There is not a conversion to trail use. So we're just talking about what is arguably a temporary taking, right? That's right. Well, and we're talking about the framework for analyzing a takings claim. We think that's critical. So again, Ladd was the first case you've seen that didn't involve a need to, or sorry, involved a need to but not conversion to trail use through a trail use agreement. And that is the moment when Section 8D, that's the part of the Trails Act statute that actually under Per Se could affect a taking. Section 8D is the provision that prevents easement expiration under state law and allows interim trail use and rail banking. So in a case like this, this is the first case to reach final judgment since Ladd. And of course, we asked for a monk hearing in Ladd also. And so here we are again. In this case, we think this case shows how wrong Ladd was. The railroad- Is your position that when there is no ultimate trail agreement reached, is your principal position or one of your positions, there is no taking or rather an analysis under some non-brightline rule is required? Well, essentially both. But as a preliminary matter, that you have to use a multi-factor test like Penston. I don't understand what both means. Well, we would of course argue that- It's your position, you want us to overturn Caldwell and say that the NITU is not itself a determinant factor in the taking analysis, that the only is the actual agreement. That's right. For a physical taking anyway. Your backup is that when we're looking at this temporary period, when there's been no conversion, that has to be done under a regulatory taking analysis. That's right. I'm sorry. You keep putting a little qualifiers. Is one of your positions that when there is no ultimate trail agreement, there is no taking? Our position is, if section AD is not triggered, that cannot support a physical takings claim. It could be analyzed as a regulatory takings claim if you applied those Penn Central factors. No, you would not. Why isn't it a temporary take? Before we get into regulatory versus physical, it's a temporary taking, right? I mean, period, a number of things might happen. That's right. The rail could do nothing other than talk to the trail people, or they could actually give the land over and it could be used for a trail during that interim period, irrespective of the abandonment. Let's assume that happens. During that interim period, they exceed what the rights are under the easement, and in fact, do use the property for a trail, for trail use. During just the need-to period? Yes. We're only talking about the need-to. That's not permitted by the need-to. Trail use is only permitted once there's a trail use agreement in place. What is the extent to which they can do under the need-to? They can just negotiate, but they have to keep the... That's correct. The uses that are permitted under the need-to are exactly the same as what was permitted under the original easement. It's still defined by the easement that the railroad holds. The railroad's permitted to do things like start to take up tracks, move towards abandonment, but no, trail use is not allowed until that trail use agreement is reached, which triggers Section 80. That is the moment when any physical taking could possibly accrue and liability could attach. You've made an argument, I think principally relying on Tahoe Sierra, that delays in government consideration are either not a taking or subject to some non-brightline taking analysis. I keep using that because it seems to me I don't know whether the Arkansas... The bid at the end of the Arkansas Game Commission is the same as Penn Central or different from Penn Central or what, but some non-brightline analysis. It seemed to me that, at least in Tahoe Sierra, and I can say my question is, is there any case of the following sort? Here we have the government saying, you, the property owners, gave up your right only against a railroad use. The question of railroad use is over and done with. The July 3rd NITU says we are done with that. The only reason we are delaying reversion of your property right is to consider whether we're going to take it in a full physical way. Why in the world would that be subject to a regulatory takings analysis when the government delay is only to consider whether to seize the thing, seize it in the sense of giving it to somebody else indefinitely for hikers and bikers? Your question touched on this. At the moment of the NITU, it's not at all clear what will happen. It may result in a trail use agreement. It's not going to result under the NITU in non-abandonment. That's not correct. This is not purely hypothetical. There's already been a case decided in the CFC where, this is the Memmer case that we discussed in our briefing, where there was a NITU to simplify the facts of it. I'm sorry, but that's just the railroad's choice, right? That's right. That's important. July 3rd NITU says, and in fact, if I remember right, under your regulation, they didn't even need permission for this. This was actually by regulation exempt because they hadn't used it for two years or five years or whatever it was. It was actually exempt. The only condition or the condition on the easement was you have to use it for this. The government has now said, we are not ourselves taking action for any purpose related to that use anymore. We're only taking action to buy time to allow a real taking. Why would that be subject to a regulatory taking analysis? Because that is but a regulatory action. We think it's not unlike a situation like Block v. Hirsch, where you have a pre-existing relationship between a landlord and a tenant. The government comes in, messes with that relationship, tells the tenant that it can hold over beyond the time the landlord would prefer. The Supreme Court said, that's not a bright line taking. You've got to ask whether that regulation goes too far. In a case like FCC- All of those cases, including Block, are about police power interests in the use to which the Once you issue your July 3rd NITU, you have said, as far as the government is concerned, we're not interested anymore in railroad use, which was the precondition for keeping the property out of the hands of the underlying fee interest owner. Now you're just talking about we may have interest in using our condemnation power, not formally, but our physical takings power, the way we always do for a public purpose. It seems to me that has crossed the line into, we're just preparing, trying to arrange a real physical taking. There's a couple of things here. For one thing, the Memmer case demonstrates that a NITU does not always- That's where the railroad said- We're not going to abandon. We're going to continue our railroad use. So it's hard to see if you follow that, and particularly the CFC's interpretation of that as requiring a finding of a per se compensable taking here, you get results like Memmer, where it's hard to see how the government action delayed anything, because the railroad essentially said, nevermind, not going to abandon after all. I didn't see an argument in this court from you that said, look, conceptually, there's a difference in time between the NITU issuance and the date that in the absence of the Rails to Trails Act, the railroad would have abandoned it. And it's crucial in every one of these cases that we identify the 30-day difference or the 60-day difference. I didn't see you're making an argument in this court about that. In this case, there is something interesting about this particular case, because of course, when a railroad files a petition for abandonment or a notice of exemption, it's not as though it abandons its line right away. It has a full year to use its discretion to do so. It can get extensions. Sometimes it elects not to exercise that discretion. That's true even if a NITU isn't filed. That's right. That's what I'm saying. So in the but-for situation, if there had been no need to, the government, or sorry, the railroad would have had a full year to consummate abandonment. As it turns out, in this case, the need to expire, the railroad quickly abandoned, all of that happened. The easement reverted to the underlying landowners within that one year. So it's very difficult to know whether there was even a delay here at all. And I want to point out that- Can I, I know we've asked you this about three times already, but can I get back? It seems to me that your big point then is we shouldn't view the NITU as a taking it all, or at best, under a regulatory taking doctrine where it's almost never going to be compensable. Right. We think the best framework for analyzing these cases is to set the date of accrual for permanent physical takings, which is the type of case that you had in Purcell, Caldwell, Barclay. At the moment, the statute's preclusive effect is actually triggered, and that is when a trail use agreement is reached. The NITU is just- So that's not the position you took in Caldwell though, right? That is the position that we took in this court in Caldwell. But in the subsequent cases, you did embrace the Caldwell rule. We acquiesced to this court's decision. And got a whole lot of suits dismissed as untimely. At the time of Caldwell, of course, it was not at all clear to us that LAD was going to be the result, that this court was going to determine that a NITU on its own with nothing more could constitute a physical taking. Caldwell, of course, included a footnote saying that was not the court, and they weren't deciding it. When LAD was decided, we, of course, objected strenuously. Judges Moore and Ghiarza would have taken the case en banc to correct what they called the egregious legal error of Caldwell. So here we are, presenting both of those cases, arguing that they should both be overturned to reform this court's framework for considering these NITU-only cases. And here's why it's critical. This is just one small case, but there are lots of these cases already filed in the federal claims. There are going to be more. When you say lots, do you have any rough idea? Because the dollar amount here is really small. That's right. This case is unusual in that it only involves one landowner and two parcels. Many of these cases involve hundreds of landowners. I believe there are over 100 Trails Act takings claims pending in the Court of Federal Claims right now. And of course, those aren't all NITU-only claims. But that is the new strategy for bringing these cases is to file them immediately after the NITU is issued and not wait to see what's going to happen. And the Court of Federal Claims thus far, relying on LADD, has been willing to issue liability determinations, not waiting to see at all how things play out. So that includes cases in which there's an abandonment ultimately at the end of the NITU or not, right? That's right. That's right. The Court of Federal Claims has said, listen, there's been a NITU. That means there's been liability. And I also want to point out- What happens when... I mean, are there situations where there's liability determined for the NITU and then there's ultimate abandonment after the fact? I'm not... Well... I mean, it seems to be unworkable in a certain sense. So that would be, I guess, a case like this, if there had been a liability decision before abandonment. I'm not sure that that has happened. Well, no. I mean, I think it would be more like a case like where they found a... Well, I don't know what it would be. But at a certain point, if an abandonment actually occurs and the case is dragging on, do they have to hold the case until the decision is actually final on conversion? I think that's what makes the most sense. Yes. If you're going to file a case immediately after the NITU, I think, yes, it does make sense to hold it and wait and see what happens. Can I ask you, if there were a multi-factor analysis, does that look different in every single property-by-property case? Or why wouldn't, if you ran down the severity, reasonable investment-backed expectations, duration, why wouldn't one reach a, let's call it, categorical judgment that when the government has said for a period of at least six months, and I gather, in some cases, much, much longer than six months by virtue of extending these NITUs, that that is a taking. You are dispossessed of a traditionally recognized formal interest in property at the government's behest, subject, of course, to your saying, well, they've either actually, the railroads changed its mind or something like that. Well, I do think it would involve a property-by-property consideration. What would be different? Well, the reasonableness of investment-backed expectations, for one thing. You bought a piece of land with a easement that's limited to railroads. The government has said, no more railroad interest. But the abandonment of that easement is always something that the railroad has the right to do, but will not necessarily do. So these landowners... Except for that, whatever that case you mentioned, like something like... Is that a freakishly rare thing when the railroad says, whoops, we want to run a railroad on here after all? I'm not sure that it is. I mean, again, a lot of these cases are being filed... Is there more than one case? That's the only case I know of that has had that happen, but that's just what I know. Anyway, it seems to me, partly I'm wondering, it seems to me when I read the Supreme Court cases, it's, to my mind, something of an open question. What category of takings analysis this sort of thing fits into? And if I start thinking about the kind of three factors in Penn Central or four considerations at the end of Arkansas, it seems to me awkward, I guess, to say that there is a case-by-case variation in the answer to that when exactly the same thing is going on. You would otherwise have your property right back. We say, no, you may not. You're dispossessed of it for this period solely for the reason of our trying to figure out if we can take it from you more or less permanently. What's left to decide? Again, perhaps we're simply disagreeing about how those factors would be applied. So in Purcell, this court said, the government argued that background principles of property law had sort of affected the landowner's property interests. And this court said, that's not really relevant to a physical taking, which we're talking about, because there had actually been a physical conversion to trail use and fusion of easement reversion. That's not quite physical, but it's sort of physical. Right. So this court said that those sort of background principles, the pervasiveness of federal regulation of railroad abandonment, could be relevant to thinking about the reasonableness of investment-backed expectations. It seems to me that when the NITU says, we, the federal government, have no more interest in railroad use, that that's just gone. I'm not sure the NITU really says that. What the NITU says is that the railroad and a potential trail sponsor have shown an interest in negotiating. We're going to let them do that for 180 days. For a purpose, I think, undisputedly here and outside the condition on the 1870 granted easement. But here's another way that I'm looking at it. In a situation like Loretto, which is, of course, that narrow category of permanent physical takings, we wouldn't think of the moment of taking or the act that constitutes the taking as the statute that would later allow the cable box to be installed on the building. It's the physical invasion itself. And that's the analogy we're trying to make here, is in Purcell, again, this court said, it's not the passage of the Trails Act in 1983 that constituted the taking. It's when the physical invasion starts. If you file your case before that, we would think it was unright. That's what this court said. I think you can draw an analogy to the NITU. Right, but that's why this is not quite a physical invasion. This is a government declaration that we hereby forbid you to reacquire your state law rights for a period of time. A traditional piece of property, an easement. They would have come back to you because the railroad use is gone. But you may not have that now for six months, or in some cases, I gather, years and years, because you see these things keep getting extended. And we are legally barring you from doing that. That's why it's not quite physical, but it's kind of the next best thing. It's not regulating your use. It's just saying, you can't have your state law property right back. Well, we would say it is regulating the railroad's abandonment. And that's something SDBs- They're not the property owner. They are an easement holder, right? And the NITU, when you get to it, says, we, the government, no longer have an interest in the railroad use. Right. It's up to you. If you want to abandon, and as I'm going to infer, almost always when they petition to abandon, they are going to abandon. There may be a few exceptions, but those seem truly exceptional as far as we're being told. I think we're just looking at it differently. We see there a strict difference between the moment that Section 8D is actually triggered. That's the moment when the statute takes effect, and it prevents that easement from expiring. Before that, this is just a regulatory action, much like other types of regulatory actions that might require you to get a permit before you can use your land in the way that you desire.  While you all are trying to find a municipality to make it into a trail. It prevents easement expiration upon, in the case of interim use, which only occurs after a trail use agreement is reached. That's how the statute reads. The regulatory language tracks that language saying, if an interim trail use agreement is reached and thus interim trail use established. That's what we say could be a physical taking. The reversion during, let's say it takes two years or something, because it's just three extensions of 188. The reversion could take place during that time, because you said the statute doesn't bar that? The statute does not discuss use of a need to. The statute was passed in 1983. The SCB regulatory scheme that uses a need to wasn't put in place until much later. In fact, in the Purcell case, there was no need to. The only government action in that case occurred at the same time as the trail use agreement. There was no sort of precursor need to. The fact that STB has changed its regulatory scheme and now does this need to earlier in the process, I think has obscured the moment of taking, but it hasn't actually changed it. That trigger of section 8D, as this court set in Purcell, and as the statute and regs read, that establishment of trail use is only allowed once you've fulfilled the condition of having third parties reach a trail use agreement. And we're saying before that moment, you can't have a physical taking. Maybe you could analyze the need to alone as a potential regulatory takings claim, perhaps an extraordinary delay claim. If it indeed goes on and on, you would analyze that under Penn Central, and you could indeed find a taking. We don't think that you would, but you could. But we think that's the right framework to analyze these cases, not the framework that Ladd gave us. And I see I'm well over time. We'll restore a few minutes. Thank you. Thank you. May it please the court. As a threshold matter, this court, as you held in Barclay and Caldwell, can't overturn a previous panel that has ruled on these issues. And so PRESO 2 was an en banc. And so just as a threshold matter, this court can't overrule those cases. The government has stipulated that the railroad only held an easement for railroad purposes and that the Caklins owned on the date of the NITU. And on the date of the NITU, the Caklins were prevented from using and possessing their property, their use and enjoyment. Even if we put aside all the government's en banc questions, didn't the trial court err by not applying the Arkansas fishing game factors? No, because there's a bright line rule that we've heard from this court over and over. Yes, but Arkansas postdates Ladd. Yes, but as far as Trails Act jurisprudence goes from this court, this court talked about, in PRESO, about physical takings versus regulatory takings. I'm not talking about that. Arkansas fishing game is a physical takings case. It's a temporary physical takings, though, which is certainly what we have here if we have a physical taking at all. Yes, and so... Why didn't the trial court have to apply the factors in Arkansas? Well, I think because we had guidance from the Ladd court on temporary takings. And so, again, this court has always said that there is a bright line rule that on issuance of the need to, there a taking occurs. And whether it's temporary or permanent, we don't know. Do you think Ladd is consistent? If that's the rule you take from Ladd, I'm not sure Ladd actually looked at it as a temporary taking, which I think it is under Arkansas. Do you think Ladd is now consistent with Arkansas fishing game? I'm not really sure about that, Your Honor. I mean, that's the question we have to answer, isn't it? I mean, we have Supreme Court precedent now. If Ladd's inconsistent, then it's either been overruled or we have to go on bonk to conform our precedent with Arkansas fishing game. Well, I think that the position that the government has taken, and which is inconsistent with this court in all the previous Trails Act takings cases, invites uncertainty. But what's your position on Arkansas fishing game? That's what I'm trying to get at. Do those factors for temporary physical takings apply here? Or do you think that this is still a permanent physical taking? I don't think this is a permanent physical taking. I think this is a temporary physical taking. But again... Does an Arkansas fishing game then make clear that we have to apply that multi-factor test? I don't think so, because I don't think this is a regulatory taking. Arkansas fishing game is not a regulatory takings case. It's a temporary physical takings case. If you admit that this is a temporary physical takings, then doesn't it have to go back in some form, either through an en banc action or from the panel, to apply those factors? Again, I don't think so, Your Honor. Why not? Because I think that the precedent from this court, and we had en banc in Preso 2, the precedent from this court saying that this is a bright line rule, and to invite a different analysis would just create uncertainty, as the court held in Barclay. Can I just pursue that a little bit? Sometimes there are intervening Supreme Court decisions after an otherwise governing panel decision, and we have to make a judgment. Sometimes the judgment is the intervening Supreme Court decision is actually sufficiently clear that even a panel of this court can say that a previous panel decision has been superseded. And sometimes we make a slightly lesser judgment, which is, we need to rethink this, and then we often take those matters en banc. So focus on Arkansas' game decision, in particular the last couple of pages of that decision, that say that the repeated increased flooding in that matter needed to be subject to consideration of a number of factors. Severity, reasonable investment, backed expectations, the effect on that, duration. And suppose we're thinking, as I think we are thinking, about what effect that ruling has on what we have here. Do you have thoughts about whether the recurrent flooding for purposes of helping agriculture or something like that is, might be different, is the same as what's going on here? I think it's distinguishable because here, you're not just interfering with some use of the property. Here, you're dispossessing and interfering with the complete use of the property on the date the need to is issued. So it's not that you're, like I said, interfering with certain uses of the property. The landowners are dispossessed physically from the property on the date of the need to. Now, it is true that if the need to is abandoned or the notorious agreement is reached, then they are back in possession of their land, but they have been blocked for a certain period of time. And the cases that have need tos, there are several cases, many, many instances where a need to is issued and it's extended for years, seven, eight years. And so then we have a problem with uncertainty again because if we wait until a trade agreement, what about those eight years that that landowner, when they only agreed to railroad purposes, you know, for easement for railroad purposes, and now the federal government has come in and interfered and blocked their right to their land. I mean, so that's a permanent, I'm not saying it's not a permanent taking, but that's a temporary taking. And temporary takings, the compensation for temporary takings are very different than the compensation for permanent takings. Temporary takings, the compensation is for rent value. And permanent takings is for just compensation of the fair market value of their land. Do you know, by the way, we were, I was discussing with government counsel how often it happens that a railroad, having filed for abandonment, changes its mind and decides no longer to abandon. Are you aware of more than the one case that was mentioned? I am aware of another case as well. It's a case called Sour West, and the railroad hadn't run trains for 30 years and they tried to find a trail use agreement with someone and it went on for seven, eight years. And then the railroad came back in and said, wait a minute, we don't want to abandon. But those landowners have not been able to use their land or put their farms back together. You know, it is a problem. And it happens, that happens more often than not that you have a need to issue and then it's extended for years and years and years. And so, you know, I think that that is a problem with the government's analysis. And that's why I think that the case law has developed in Trails Act takings the way it has. We have a bright line rule so that we have certainty. And it may be that, you know, it's not, you know, a long taking or it's a very short temporary taking or it's a very long temporary taking. But that's why I believe that the law has developed, as it said. And that's why preso. Do you think there are two takings here? If the NITU goes on for seven or eight years and then is ultimately converted, is the seven or eight year period a temporary taking and the conversion a physical, permanent physical taking? No, I would think that upon issuance of the NITU, because you don't know whether it's going to be temporary or not upon issuance of the NITU. And so once the conversion happens, it's a permanent taking. If the conversion never happens,  But you don't know if it's permanent or temporary until a treacherous agreement is reached or not. When you file your case, you don't actually know the character of the taking you're alleging. No, when we file our case, we know that the railroad only had an easement for railroad purposes. We go through the preso test. You don't know whether it's a temporary taking or a permanent taking. Unless there's already a treacherous agreement. Sometimes that happens. That happened in preso too. Right, but if you're filing right after the NITU before the negotiation period is ended, you don't know whether you're ultimately going to have a temporary taking or a conversion. If there's no treacherous agreement reached at that time, then no, you don't. Again, that seems a pretty odd way to have a claim accrual date for a claim that you don't know what the actual character of it is. Well, the other problem that you have is what if the NITU is extended for over six years? By that time, you're time barred. Well, isn't that why Caldwell is wrong? No, I think that the Brightline rule is that once the NITU, well, Caldwell, they didn't compensate the Caldwell plaintiffs because they said you're time barred. That was the government's position then, that the NITU is the finite rule for a claim accrual. That wasn't the government's position in Caldwell. Well, that's what Caldwell held. Which it also would have been untimely. Barclay, and so Barclay infirmed Caldwell. And Barclay said, as we explained in Caldwell, a taking occurs when the reversionary interests are blocked from vesting. And Barclay also says that the NITU, the 1247D, the NITU is the governmental act that triggers a taking. And it's when the trail operator and the railroad communicate, that's what Barclay says, when they communicate that they are interested in coming up with some kind of an agreement. Except when a conversion occurs because then the conversion is the act that triggers the taking. Is it not? Well, I think that under the Fifth Amendment, it has to be a government act for you to bring a claim. And I think that's Navajo Nation. But I don't think that you can have, you know, bring a claim on, based on third party acts of third parties and the agreement, which is the ultimate conversion, that would come from third parties. Wait, that seems very confusing to me. So what is the act of the taking when a NITU doesn't issue? What do you mean when a NITU doesn't issue? Well, they don't always issue NITUs in these cases. So in those instances, what's the act of the taking? Is it not the conversion to a trail? Oh, sorry, there is no trail, right? There's no liability. I'm getting wound up in my hypotheticals. Yeah, there's no liability. If they don't issue a NITU, then they don't block the reversionary interest and it just divests the railroad. After the year period or whatever under the statute. And I think it's really important for the court to know too that, I mean, you can't issue a NITU unless all the conditions for railroad abandonment have been met. So the railroad is either going to walk away or they're going to come up with a trade disagreement if they can find a trail user. Can I ask you one question? I don't think anything has been made of in this court that was mentioned in the Court of Federal Claims. July 3rd NITU refers to, I guess, a trails agreement possibility, but also refers in passing to a public use... Public use condition. ...condition. And that seems to have disappeared from at least the briefing in the case. What am I supposed to make of that? A lot of times they go hand in hand. They say... Is that under a separate statutory regime? Yeah, there is a different statute for public use condition. So they have to apply for a public use condition as well. But I've never seen a case go through a public use condition. Because these long, long, long, long, skinny rights-of-way pretty much have one use. Is that basically trails or nothing? You know, trails. And that's really why the Trails Act was developed, is to try and save the network of railroad rights-of-way that were built in the country. And so they thought that would be a great way to do it. I want to make another point. The government says that we're arguing a per se taking. The plaintiff's position has never been that every issuance of a need-to is a per se taking. It's only if the conditions of preso have been met. So the railroad held an easement for railroad purposes. Trails exceeds the scope of the easement. Then if they issue a need-to, then a taking occurs. So if the railroad owns land and fee, there's no taking on issuance of a need-to. Again, I think that this court should... I don't really understand that. But if they have met those conditions, you are arguing that's a per se taking, not a temporary taking. Well, if they've met the conditions, then it would be a per se taking. But it's not just a per se, flat-out per se taking upon issuance of every need-to. Only the need-to is where the railroad owns an easement for railroad purposes, and it's trail use exceeds the scope. But then it's a per se taking, and in your view, Arkansas doesn't apply. Correct. Because they block and dispossess the landowners from using their land. That's all I have, Your Honors. Thank you. Thank you. Just a couple of things. First of all, I'm informed there are several other member-type cases where the railroad ultimately elected not to abandon at least a portion of its right-of-way. One of those is Creston Memorial, and I believe LAD actually involved a portion of the right-of-way, and LAD had that situation. We think those sets of cases, along with this, show the bizarre results of LAD, where you do have, as the CFC has interpreted it, a per se finding a physical take, or compensable physical taking in these short plans. I find the whole scheme a little complex, but is it right that under our case law and the way the CFC has interpreted it, in those instances where NITU has issued, but the railroad takes it back, you're now on the hook for at least some type of compensation in attorney's fees. That's correct. But if the railroad just issues a notice of abandonment and takes it back up for a year, you're not. That's right, and we think that makes no sense. Suppose a railroad took it back eight years after the NITU, and had there never been this NITU scheme, the railroad would have, in fact, abandoned it. The fee interest owner has actually lost, really, essentially permanent, but at least for six years. Why should that not be compensable? Well, a railroad, of course, could indicate intent to abandon, and then seek extensions of its time for abandonment. That amounted to the same amount of taking, and we're not seeing anyone claiming that that's a per se physical taking. I don't see how it's really any different. The Trail Fact doesn't do anything extra in that type of situation. Well, it says when the railroad has said, on July 3rd, or whenever it applied, as this one did, I think, say, we plan to abandon this on or after the approval of the abandonment. Plans can change, though, and railroads are always in control of this decision. They can change. In the ordinary course, they don't change, and it's left to the railroad to choose whether the reversion occurs. But here we have the government saying, no, you may not, you, the property owner, cannot get this back for 180 degrees, plus whatever extensions. Why is that not a taking for that time? We see that as a mere exercise of the STP's regulatory authority over railroad abandonment. Can I just, I realize your time is up, but within the class that we're talking about, the pre-salt class, so a railroad use only easement, what will the Penn Central litigation look like? It's going to be... Does the government always win because the government always has this interest in regulatory, in which case it's categorical, but it's a categorical non-taking, or is it going to vary from property to property? I think it's going to vary. Why? Well, it could in part depend on how long the, I mean, whether you have an extraordinary delay or not. This is short-taking. I mean, we wouldn't think there would be a taking under Penn Central. We've set forth how we think the, we haven't argued Penn Central in this case, in our briefing, but at the end of our brief, of course, we explained how we thought the Arkansas game and fish factors would apply, and you can see from that how we think it probably would apply in Penn Central as well. So, you know, again, I just want to touch on one thing. Again, you know, this is a really small case, but this is one of many. There are going to be more, and these attorneys are incentivized to bring these cases because their attorney's fees are covered and amount to many times, many, many times the amount of compensation awarded to landowners. Are the fees automatic? The fees are automatic if they receive compensation. Now, the landowner has accused the government of pursuing a scorched earth policy in these cases, but of course, the government has an obligation to protect the public fiscal against invalid claims, and that means on a parcel by parcel basis, answering those threshold questions in per se, whether there's a, what is the scope of the railroad's property right? Was it fee? Was it railroad purposes? Was it broader type of easement? Do the landowners actually possess the property rights they claim to? It's an extremely resource intensive type of litigation, and we want to make sure that this court sets the right framework for analyzing these claims, one that is consistent with PURSO and with the Trails Act and how it's administered by the STP. Thank you. We thank both sides.